UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| LARRY GRIGGERS, | ) | |
| RC MANAGEMENT HOLDINGS, LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-03410-JMS-DML |
| | ) | |
| JUDITH A. SHOPF, | ) | |
| | ) | |
| Defendant. | ) | |

# **ORDER**

Presently pending before the Court is Defendant Judith Shopf's Motion to Dismiss, in which she alleges that this Court lacks *in personam* jurisdiction over her, and that Plaintiffs Larry Griggers and RC Management Holdings, LLC ("RC Management") have failed to state a claim upon which relief can be granted. [Filing No. 13.] Ms. Shopf seeks to dismiss Plaintiffs' Amended Complaint for declaratory relief related to the sale of Mr. Griggers' ownership interests in several Ruth's Chris restaurants to RC Management. [Filing No. 12.] Ms. Shopf's Motion is fully briefed[1] and is now ripe for the Court's review. For the reasons stated herein, the Court **DENIES** Ms. Shopf's Motion.

---

[1] Ms. Shopf filed two nearly identical briefs in support of her Motion. First, she filed a document entitled "Defendant's Brief in Support of Motion to Dismiss" in the same docketed entry as her Motion to Dismiss. [Filing No. 13.] Three days later, Ms. Shopf filed a separate document entitled "Defendant's Brief in Support of Motion to Dismiss." [Filing No. 14.] At various points in their response brief, Plaintiffs cite to each document. [*See* Filing No. 17 at 5 (citing Filing No. 14); Filing No. 17 at 15 (citing Filing No. 13).] Filing No. 14 appears to be virtually identical to Filing No. 13 at 3-17 except that the latter contains justified text, while the former does not. Consistent with Local Rule 7-1, the Court will consider the Brief that was filed separately – Filing No. 14 – as the operative brief in support of Ms. Shopf's Motion to Dismiss. Counsel should take care not to filed repetitive filings in the future, and to comply with local rules.

# I.
## APPLICABLE LEGAL STANDARD

### A. Federal Rule of Civil Procedure 12(b)(2)

When a defendant moves to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(2), "[t]he plaintiff bears the burden of showing that personal jurisdiction over the defendant exists." *Claus v. Mize*, 317 F.3d 725, 727 (7th Cir. 2003). When, as here, the Court "rules on a defendant's motion to dismiss based on the submission of written materials, without the benefit of an evidentiary hearing . . . the plaintiff 'need only make out a prima facie case of personal jurisdiction.'" *Purdue Research Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003) (quoting *Hyatt Int'l. Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002)). Accordingly, "[o]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Id.* at 782-83. Factual disputes, however, are resolved in the plaintiff's favor. *Id.*

"A federal district court's personal jurisdiction over a defendant is established in a diversity-jurisdiction case . . . only so long as the defendant is subject to the jurisdiction of a court of general jurisdiction in the state where the district court is located." *Northern Grain Mktg., LLC v. Greving*, 743 F.3d 487, 491 (7th Cir. 2014). Indiana Trial Rule 4.4(A) serves as Indiana's long-arm provision and expands personal jurisdiction to the full extent permitted by the Due Process Clause. *See LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 965-66 (Ind. 2006). "Thus, the statutory question merges with the constitutional one—if [Indiana] constitutionally may exercise personal jurisdiction over a defendant, its long-arm statute will enable it to do so." *Northern Grain*, 743 F.3d at 492.

"The federal constitutional limits of a court's personal jurisdiction in a diversity case are found in the Fourteenth Amendment's due-process clause." *Id*. "[F]ederal constitutional law draws a sharp and vital distinction between two types of personal jurisdiction: specific or case-linked jurisdiction, and general or all-purpose jurisdiction." *Abelesz v. OTP Bank*, 692 F.3d 638, 654 (7th Cir. 2012). "If the defendant's contacts are so extensive that it is subject to general personal jurisdiction, then it can be sued in the forum state for any cause of action arising in any place. More limited contacts may subject the defendant only to specific personal jurisdiction, in which case the plaintiff must show that its claims against the defendant arise out of the defendant's constitutionally sufficient contacts with the state." *uBID, Inc. v. GoDaddy Group, Inc.*, 623 F.3d 421, 425 (7th Cir. 2010).

**B.      Federal Rule of Civil Procedure 12(b)(6)**

Under Rule 12(b)(6), a party may move to dismiss a claim that does not state a right to relief. The Federal Rules of Civil Procedure require that a complaint provide the defendant with "fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007)). In reviewing the sufficiency of a complaint, the Court must accept all well-pled facts as true and draw all permissible inferences in favor of the plaintiff. *See Active Disposal Inc. v. City of Darien*, 635 F.3d 883, 886 (7th Cir. 2011). A Rule 12(b)(6) motion to dismiss asks whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court will not accept legal conclusions or conclusory allegations as sufficient to state a claim for relief. *See McCauley v. City of Chicago*, 671 F.3d 611, 617 (7th Cir. 2011). Factual allegations must plausibly state an entitlement to relief "to a degree that rises above the speculative level."

3

*Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012). This plausibility determination is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

## II.
### BACKGROUND

#### A. The Proposed Sale

Since 1994, Larry Griggers has been Chairman and CEO of various Ruth's Chris entities in Indiana and Missouri, including Palomar Indy, Inc., ("Palomar"), Pinnacle Management, Inc., ("Pinnacle"), Sizzle, LLC, ("Sizzle"), and Bacchus, LLC, ("Bacchus"), (collectively, "the Ruth's Chris entities"). [Filing No. 10 at 2.]

Ryan Rans, a member of RC Management, made an offer to purchase Mr. Griggers' ownership interests in the Ruth's Chris entities. [Filing No. 10 at 3.] Mr. Rans is also an existing investor, co-franchisee, and Board member of the Ruth's Chris entities. [Filing No. 10 at 2.]

#### B. The Franchisor's Rights

Mr. Griggers' transfer of ownership and management of the Ruth's Chris entities was subject to preapproval by a Ruth's Chris franchisor (the "Franchisor"). [Filing No. 10 at 3.] The transfer was also subject to a right of first refusal in favor of the Franchisor. [Filing No. 10 at 3.] After Mr. Rans made the offer to purchase Mr. Griggers' ownership interests in the Ruth's Chris entities, Mr. Griggers notified the Franchisor of the prospective sale and the Franchisor elected against exercising its right of first refusal. [Filing No. 10 at 3.] In addition, the Franchisor approved Mr. Rans as a successor to Mr. Griggers under certain conditions. [Filing No. 10 at 3.]

#### C. Shareholders' and Unitholders' Rights

Mr. Griggers' transfer of ownership and management of the Ruth's Chris entities was also subject to a right of first refusal by other shareholders and unitholders of the Ruth's Chris entities.

4

[Filing No. 10 at 3.] Each of the Ruth's Chris entities has the following nearly identical language in its respective governing documents:

> Offer for Sale; Notice of Proposed Sale. If any [Shareholder/Unitholder] (the "Transferring Party") desires to Transfer any of his … [Shares/Units] in any transaction …, such Transferring Party shall first deliver written notice of such desire to do so (the "Notice") to the other [Shareholders/Unitholders] … [specifying] … (i) the name and address of the party to whom the Transferring Party proposes to Transfer the Units (the "Offeror"), (ii) the number of [Shares/Units] the Transferring Party proposes to Transfer …, (iii) the consideration per [Share/Unit] offered by the Offeror to the Transferring Party for the proposed Transfer, and (iv) all other material terms and conditions of the proposed transaction. The Notice shall be accompanied by a copy of the offer from the Offeror to the Transferring Party or such other evidence of the offer that is reasonably satisfactory to the other [Shareholders/Unitholders].
>
> Option to Purchase. (a) The other [Shareholders/Unitholders] shall have the option to purchase all but not less than all of the [Shares/Units] Proposed for Transfer. [The Shareholders/Unitholders] shall have the first option … to purchase all or any part of the [Shares/Units] Proposed for Transfer for the consideration per [Share/Unit] and on the terms and conditions specified in the Notice. The First Option must be exercised no later than thirty (30) days after such Notice has been delivered….

[Filing No. 10 at 6.]

Notice of the proposed transfer was sent to the shareholders and unitholders of the Ruth's Chris entities as follows:

- Palomar's shareholders were provided notice of the proposed transfer on August 9, 2017 and were provided thirty days within which to exercise a right of first refusal;

- Pinnacle's shareholders were provided notice of the proposed transfer on August 9, 2017 and were provided thirty days within which to exercise a right of first refusal;

- Sizzle's eligible unitholders were provided notice of the proposed transfer on August 9, 2017 and were provided thirty days within which to exercise a right of first refusal;

- Bacchus' eligible unitholders were provided notice of the proposed transfer on August 17, 2017 and were provided thirty days within which to exercise a right of first refusal. [Filing No. 10 at 4-5.]

5

All rights of first refusal granted to the unitholders and shareholders of the entities have expired without the exercise of any of those rights, with the exception of Ms. Shopf's rights discussed herein at Part II.D. [Filing No. 10 at 5.]

**D.     Ms. Shopf's Rights**

Judith Shopf, the widow of Mr. Griggers' former business partner, is a successor in interest to her late husband's ownership interest in the Ruth's Chris entities. [Filing No. 10 at 2-3.] As a shareholder and eligible unitholder in Palomar, Pinnacle, Sizzle, and Bacchus, Ms. Shopf was provided with notice of the proposed transfer along with the rest of the shareholders and eligible unitholders of each entity. [Filing No. 10 at 4-5.]

In a letter dated September 11, 2017, Ms. Shopf's attorney challenged the transfer, arguing that a "bundled" sale was not permissible, the purchase price was unreasonably high, and the transaction violated the Ruth's Chris entities' governing documents. [Filing No. 10 at 7.] In response, Mr. Griggers and Mr. Rans extended the time for Ms. Shopf to exercise a right of first refusal. [Filing No. 10 at 7.]

Ms. Shopf has not made a purchase offer for any of the relevant shares of any entity in which she has rights or at any price; instead, her attorney suggested that Mr. Rans purchase her shares. [Filing No. 10 at 7-8.]

Notwithstanding Ms. Shopf's dispute concerning the proposed transaction, Mr. Griggers and RC Management closed on the transaction. At the time of the closing, Mr. Griggers and RC Management signed an agreement (the "Provisional Agreement") to honor Ms. Shopf's right of first refusal consistent with the terms of the Ruth's Chris entities' governing documents. [Filing No. 10 at 9.] The Provisional Agreement provided, in relevant part, that:

WHEREAS, as an accommodation to Mrs. Shopf, Sellers have agreed to two (2) consecutive extensions of the time available for her to consider and exercise her rights of first refusal under the First Refusal Agreements, such that the allowable time for such exercise has

been extended through to and including 12:00 noon on October 13, 2017 (the "**Extension Deadline**"); and

. . .

WHEREAS, the Buyers and Sellers have agreed, that as a condition to Closing, that the Offered Interests shall be preserved, and all of Mrs. Shopf's rights under the First Refusal Agreements shall be fully respected, through the expiration of the Extension Deadline;

. . .

(a) The parties acknowledge and agree that pursuant to the express terms of the First Refusal Agreements, Mrs. Shopf may elect to exercise her right of first refusal with respect to any of the Offered Interests upon her agreement to acquire the Offered Interests "for the consideration" and "on the terms and conditions" on which Buyers have

. . .

7

agreed to acquire those same Offered Interests under the Purchase Agreement. The parties further acknowledge and agree that the "terms and conditions" specified in the Purchase Agreement require the simultaneous purchase by Buyers of all of the Offered Interests and the Other Interests, and that Buyers have no right or option to purchase less than all of the Offered Interests and Other Interests. Accordingly, under the express terms of the First Refusal Agreements, the effective exercise of Mrs. Shopf's right of first refusal (if desired) with respect to any of the Offered Interests would require her to agree to simultaneously acquire all of the Offered Interests and the Other Interests, and to satisfy the other terms and conditions of the Purchase Agreement.

(b) The parties further acknowledge and agree that as an accommodation to Mrs. Shopf and the other affected shareholders/unitholders of the Companies, Sellers' Offer Notice permitted Mrs. Shopf and such other shareholders/unitholders to exercise their rights of first refusal, separately, with respect to each of the Companies, subject only to their agreement to acquire (individually or in concert with any or all of the other affected shareholders/unitholders), all of the Offered Interests with respect to such Company. With the exception of Mrs. Shopf, none of the other affected shareholders/unitholders have disputed their rights or otherwise expressed an interest in acquiring any of the Offered Interests within the deadlines specified in the First Refusal Agreements.

(c) In an effort to resolve and settle the pending dispute with Mrs. Shopf, Buyers agree to hold the Offered Interests subject to and will honor and allow Mrs. Shopf to exercise her right of first refusal with respect to the Offered Interests of any one or more of the Sellers in any one or more of the Companies, <u>at any time prior to the Extension Deadline</u>, by agreeing to acquire all of the Offered Interests of such Seller in such Company, without regard to whether Mrs. Shopf purchases any other Offered Interests. For avoidance of doubt and by way of example, Mrs. Shopf would have the right to purchase all ▬ of the shares owned by ▬ in Palomar Indy, Inc. regardless of whether Mrs. Shopf purchases any of the other Offered Interests. In the event Mrs. Shopf exercises her right of first refusal as provided in this subsection (c), the purchase price payable by Mrs. Shopf shall be as set forth in the applicable Offer Notice (for a Company), and the terms of such payment shall be as provided in the applicable First Refusal Agreement.

[Filing No. 10-5 at 1-3 (redaction in original)].

### E. This Suit and the Related Louisiana Suit

On October 6, 2017, Mr. Griggers and RC Management filed suit in this Court against Ms. Shopf, requesting declaratory judgment on seven grounds relating to the transaction and Ms. Shopf's rights. [Filing No. 10 at 10-11.]

One week later, Ms. Shopf filed suit in Louisiana state court (the "Louisiana Suit") against Mr. Griggers, RC Management, and several others seeking a preliminary injunction and temporary restraining order prohibiting the proposed transfer. [Filing No. 17-1 at 7.] On October 20, 2017, the Louisiana Suit was removed to the United States District Court for the Eastern District of Louisiana. *See* Notice of Removal, *Shopf v. Griggers*, No. 2:17-cv-10958 (E.D. La. Oct. 20, 2017), ECF No. 1. In the five months since, the Louisiana District Court dismissed the Louisiana Suit, *id*. at ECF No. 27, and, on March 23, 2018, denied Ms. Shopf's Motion for Reconsideration, *id*. at ECF 45.

The case before this Court, however, remains pending, and Ms. Shopf's Motion to Dismiss is ripe for the Court's review.

## III.
### DISCUSSION

Ms. Shopf moves to dismiss Plaintiff's Amended Complaint on two grounds, each of which the Court discusses, in turn.

### A.    Personal Jurisdiction

Ms. Shopf first moves to dismiss Plaintiffs' Amended Complaint on the basis that she is not subject to this Court's personal jurisdiction.[2] [Filing No. 13 at 1-2.] At the outset, the Court notes that Ms. Shopf claims that she is "clearly not subject to general jurisdiction in Indiana."

---

[2] The Court's consideration of Ms. Shopf's Motion to Dismiss for lack of personal jurisdiction is guided by the evidentiary principles set forth by the Seventh Circuit in *Purdue*, providing that "[o]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction" and "that, under the prima facie standard, the plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Purdue*, 338 F.3d at 783. Accordingly, the Court's discussion in Part III.A necessarily references materials outside of the pleadings that were submitted by the parties, while the Court's discussion in Part III.B, pertaining to Ms. Shopf's argument that Plaintiffs have failed to state a claim, will disregard such materials.

[Filing No. 14 at 7.] Plaintiffs, however, do not contend that Ms. Shopf is subject to general jurisdiction in Indiana, and the Court agrees that she is not. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846, 2851 (2011) (citing *Int'l. Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement*, 326 U.S. 310, 317 (1945)). Therefore, the Court focuses its inquiry on whether specific jurisdiction exists in this case.

Ms. Shopf argues that specific personal jurisdiction does not exist because she does not have minimum contacts in Indiana and did not purposely avail herself of the privileges of conducting activities within the state. [Filing No. 14 at 6-9.] She specifically alleges that her corporate affiliation, stock ownership, and membership in an LLC are insufficient to form a basis for *in personam* jurisdiction. [Filing No. 14 at 6-7.] In addition, Ms. Shopf argues that she "did not reach out beyond her home state of Louisiana and execute a contract with an Indiana business entity," but was merely "a successor in interest to her late husband's shares in these organizations" and that she "did not participate in the sale of any shares, memberships, or interests" in the Ruth's Chris entities, is not a managing member thereof, and does not own voting shares or units. [Filing No. 14 at 8-9.] Moreover, Ms. Shopf argues that she has not breached a contract causing injuries in Indiana. [Filing No. 14 at 9.]

In response, Plaintiffs argue that Ms. Shopf's contacts with Indiana go beyond mere passive stock ownership. [Filing No. 17 at 16.] In particular, Plaintiffs argue that the following actions are enough to establish personal jurisdiction over Ms. Shopf:

- Ms. Shopf, through her counsel, "sent communications to Indiana accusing Plaintiffs of misconduct, proclaiming her displeasure with the transaction, noting her intent to exercise her right of first refusal, and requesting further information," [Filing No. 17 at 15];

- Ms. Shopf "enjoyed the distributions paid to her on account of her ownership in entities organized under Indiana law that operate Indiana businesses and for which [she] has paid taxes to the State of Indiana," [Filing No. 17 at 16];

10

- Ms. Shopf "actively participated in the management" of the Ruth's Chris entities when she accompanied "her husband – who was co-founder, franchisee, and Chairman – to Board and management meetings in Indiana" at which time she "would voice her own opinions about business decisions being discussed," [Filing No. 17 at 16]; and

- Ms. Shopf unsuccessfully "demanded to continue receiving her husband's Board fees," [Filing No. 17 at 16].

Plaintiffs argue that such actions satisfy two elements of the three part test for specific jurisdiction because they show (1) that Ms. Shopf purposefully availed herself of the privilege of conducting business in Indiana, and (2) that her injury arises out of her contacts with Indiana. [Filing No. 17 at 14-20.] Plaintiffs also distinguish the cases cited by Ms. Shopf, arguing that such cases do not pertain to instances where, as here, the stock or unit ownership is the subject of the litigation. [Filing No. 17 at 17.] Regarding the third element of the three part test for specific jurisdiction, Plaintiffs argue that Indiana's interest in deciding this dispute is great because the agreements related to three of Ruth's Chris entities are governed by Indiana law, while the burden on Ms. Shopf is low due to the efficiencies of modern litigation, travel, and communication. [Filing No. 17 at 20-22.]

In her reply brief, Ms. Shopf argues that she "has not purposefully availed herself of anything in Indiana" and distinguishes her case from *Tankersley v. Albright*, 374 F. Supp. 530, 531 (N.D. Ill. 1973), by pointing out that the receipt of distributions from entities within the forum state was not the basis of the *Tankersley* holding. [Filing No. 20 at 2-3.] In addition, Ms. Shopf discusses each action alleged by Plaintiffs and argues that none is sufficient to establish personal jurisdiction. [Filing No. 20 at 5 (arguing that a letter from Ms. Shopf's counsel is not enough to satisfy personal jurisdiction requirements); Filing No. 20 at 7 (arguing that stock ownership alone is an insufficient basis for personal jurisdiction); Filing No. 20 at 8 (arguing that "a non-forum

11

defendant's ownership interest" in a business entity located in the forum state is "insufficient to allow the exercise of personal jurisdiction"); Filing No. 20 at 10 (arguing that "limited contact with a state through personal visits does not satisfy the minimum contact test under the Indiana long-arm statute"); Filing No. 20 at 11 (arguing that acquiring ownership interests by inheritance in insufficient to supply minimum contacts).]

In order for a court to exercise specific jurisdiction, "there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773, 1780, __ U.S. __ (2017) (quoting *Goodyear*, 564 U.S. at 919). "The connection must be of the defendant's creation, not of the plaintiff's," *Ariel Investments, LLC v. Ariel Capital Advisors LLC*, 881 F.3d 520, 522 (7th Cir. 2018) (citation omitted), and the inquiry must focus on "the relationship among the defendant, the forum, and the litigation." *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017) (quotation omitted). "A single contact with the forum state may satisfy the standard of minimum contacts if the contact produces a substantial connection with the forum state and the connection is related to the lawsuit." *Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 787 (S.D. Ind. 2015).

The parties cite numerous cases, attempting to fit the nuances of this case into fact patterns presented by these other cases. But the parties have not presented, and the Court has not found through its own research, any one case that is analogous to the facts here. As such, rather than conduct a detailed analysis distinguishing and detailing various facts, the Court looks to the broader principles concerning specific jurisdiction.

First, by itself "a contract with a forum-state party does not automatically establish personal jurisdiction in the forum." *Johnson v. Hartwell*, 690 F. App'x 412, 413 (7th Cir. 2017) (citing

*Northern Grain*, 743 F.3d at 493-94). Instead, courts examine "prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other to determine if the defendant has purposefully availed itself of conducting business in the forum." *Id.* (quotations omitted). In sum, "[w]ith respect to interstate contractual obligations," the Supreme Court has "emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (citations and quotations omitted).

Moreover, numerous cases, including one cited by both parties – *Tankersley v. Albright*, 374 F. Supp. 530 – stand for the proposition that "the broader activities of the defendants . . . should be evaluated in determining whether there is personal jurisdiction to support this action." *Id.* at 534; *see also Kopfman v. Ensign Ribbon Burners, LLC*, 803 F. Supp. 2d 914, 918 (N.D. Ill. 2011) (providing that certain contacts, standing alone, likely would be insufficient to establish specific jurisdiction, but that, taken together, they were sufficient to establish specific jurisdiction); *F. McConnell & Sons, Inc. v. Target Data Sys., Inc.*, 84 F. Supp. 2d 961, 972 (N.D. Ind. 1999) (finding that "[t]aken together," a defendant's contacts were "in no way 'random,' 'fortuitous,' or 'attenuated,' and clearly demonstrate[d]" that the defendant purposefully availed itself of the benefit of conducting business in the state of Indiana). Therefore, rather than examine a defendant's contacts with the forum state piecemeal, the court must look for the point at which "a party's contacts . . . cross the threshold from offending due process to sufficient minimum contacts." *Am. Commercial Lines, LLC v. Ne. Mar. Inst., Inc.*, 588 F. Supp. 2d 935, 943-44 (S.D. Ind. 2008) (citing *Citadel Group Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757 (7th Cir. 2008)).

In this case, the Court finds that, taken together, Ms. Shopf's actions constitute sufficient minimum contacts for the Court to exercise specific jurisdiction over her. It is true that Ms. Shopf presents a detailed analysis of each action alleged, and presents caselaw that she argues supports a finding that each action is insufficient to establish the requisite minimum contacts. But even assuming *arguendo* that none of Ms. Shopf's actions, standing alone, would be sufficient to establish specific jurisdiction, taken together, Ms. Shopf's conduct crosses the threshold described in *Citadel*. Ms. Shopf's contacts with Indiana related to the Ruth's Chris entities and the transfer at issue in this case were certainly not random, fortuitous, or attenuated. For nearly 10 years, since approximately 2008, Ms. Shopf has had contractual rights related to the Ruth's Chris entities. Regardless of whether she acquired such rights through inheritance, she does not dispute the assertion in Mr. Griggers' Declaration that she signed documents assuming her late-husband's duties related to the Ruth's Chris entities and agreed to be bound by each entity's governing documents. [Filing No. 17-3 at 2; *see also* Filing No. 14 at 9 (in which Ms. Shopf admits to being a party to the Ruth's Chris entities' governing documents).]

Ms. Shopf claims that she has "no connection with Indiana other than being a passive investor," [Filing No. 20-2], but the evidence Ms. Shopf attached in support of her Motion paints a picture of someone who reached out from her home state of Louisiana and involved herself in the transfer at issue in this case. The Declaration of Ms. Shopf's son-in-law, William Helfand, states that beginning in September 2017, Ms. Shopf, though counsel, reached out to Mr. Griggers to discuss the proposed transfer, and what information she would need to exercise her rights. [Filing No. 20-3 at 2.] Through subsequent calls and emails, Ms. Shopf not only communicated her intention to exercise her rights and buy some or all of the units at issue, but she also requested and received an extension of time in which to act to exercise her rights. [Filing No. 20-3 at 2.]

14

Such active communications undercut Ms. Shopf's assertion that she did not have fair warning that she could be subject to jurisdiction in Indiana and that "Plaintiff's unilateral actions" have resulted in her being hailed into an Indiana court. [Filing No. 14 at 9-10.] To the contrary, Ms. Shopf took her own actions in the weeks leading up the filing of this suit to dispute the proposed transfers and negotiate with Mr. Griggers' counsel. On their own, such actions may or may not be sufficient to establish the requisite minimum contacts with Indiana. Taken together with Ms. Shopf's decade of ownership in the Ruth's Chris entities and voluntary assumption of her late-husband's duties related to the same, such active communication and negotiation is sufficient to establish personal jurisdiction under the unique facts of this case. Accordingly, Ms. Shopf's Motion to Dismiss is **DENIED** as it relates to Rule 12(b)(2).

### B. Failure to State a Claim

Turning now to her 12(b)(6) claim, Ms. Shopf argues that Plaintiffs have failed to state a claim under the Declaratory Judgment Act because such relief is only available: (1) "when the controversy has ripened to a point where one of the parties could invoke a corrective remedy, i.e. file a suit for damages or an injunction, but has not done so" or (2) "when a real and immediate controversy has not ripened to such a point, but it would be unfair or inefficient to require the parties to wait for a decision." [Filing No. 14 at 11 (citing *Tempco Elec. Heater Corp. v. Omega Eng'g, Inc.*, 819 F.2d 746, 747 (7th Cir. 1987)).] Ms. Shopf contends that this case does not fall into either situation contemplated by *Tempco*. As to the first category, she argues that she invoked a corrective remedy by filing suit in Louisiana weeks after Plaintiffs filed their initial complaint in this case and that Plaintiffs' claim is "an attempt to rob [her] or her right to choose the appropriate forum." [Filing No. 14 at 13.] As to the second category, Ms. Shopf summarily states that this case "clearly does not fall within the second situation because a real and immediate controversy

has ripened to a point to where one of the parties could, and did, invoke a corrective remedy." [Filing No. 14 at 13.] Ms. Shopf also argues that "[d]eclaratory relief is also inappropriate to adjudicate past conduct, such as when damages have already accrued." [Filing No. 14 at 13 (citing *Cunningham Bros., Inc. v. Bail*, 407 F.2d 1165, 1167-68 (7th Cir. 1964))].

In response, Plaintiffs first contend that what Ms. Shopf actually seeks is not dismissal for failure to state a claim but, rather, discretionary dismissal. [Filing No. 17 at 23.] Plaintiffs point out that Ms. Shopf admits in her brief that there is a real and immediate controversy, so her dismissal is not for lack of subject-matter jurisdiction. [Filing No. 17 at 23.] Therefore, rather than the two categories that Ms. Shopf highlights, Plaintiffs contend that the Court should apply a five-factor analysis from *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A. de C.V.*, 28 F.3d 572, 579 (7th Cir. 1994), which requires a court to consider the following:

(1) whether the judgment would settle the controversy;

(2) whether the declaratory judgment action would serve a useful purpose in clarifying the legal relations at issue;

(3) whether the declaratory remedy is being used merely for the purpose of "procedural fencing" or "to provide an arena for a race for res judicata";

(4) whether the use of a declaratory action would increase friction between our federal and state courts and improperly encroach on state jurisdiction; and

(5) whether there is an alternative remedy that is better or more effective.

[Filing No. 17 at 23-24.] In addition, Plaintiffs point out that although they "proceeded with closing, they preserved [Ms.] Shopf's rights in the Provisional Agreement," and that "[s]ubsequent to being served with process in this action, [Ms.] Shopf nevertheless filed a separate action in Louisiana." [Filing No. 17 at 25.]

In her reply brief, Ms. Shopf reiterates her argument that Plaintiffs are "impermissibly attempting to misuse the Declaratory Judgment Act as a pre-emptive strike to select a forum of

16

their choosing . . . and to assess their liability." [Filing No. 20 at 15.] In addition, Ms. Shopf contends that the suit she filed in Louisiana "can and will" "determine both liability and damages and thereby appropriately resolve all of the issues on which Plaintiffs seek a declaratory judgment." [Filing No. 20 at 18.]

The Court notes at the outset that Plaintiffs are correct in their assertion that the arguments Ms. Shopf proffers regarding the Declaratory Judgment Act are more properly brought as a motion to dismiss for lack of subject matter jurisdiction because if "no actual controversy exists between the parties regarding the subject on which a declaratory judgment is sought, the court lacks subject matter jurisdiction." *Davidson v. Schneider*, 2011 WL 882834, at *3 (N.D. Ill. Mar. 11, 2011) (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239–40 (1937); *Micron Tech., Inc. v. Mosaid Techs., Inc.*, 518 F.3d 897, 901 (Fed. Cir. 2008)). Accordingly, the Court will analyze Ms. Shopf's arguments on their merits pursuant to this standard. Next, even if the Court determines that it may exercise jurisdiction, it has discretion as to whether to do so. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 136 (2007) ("We have found it more consistent with the statute, however, to vest district courts with discretion in the first instance, because facts bearing on the usefulness of the declaratory judgment remedy, and the fitness of the case for resolution, are peculiarly within their grasp.") (quotations omitted). With such principles in mind, the Court now considers the substance of Ms. Shopf's arguments.

Declaratory judgment actions "serve an important role in our legal system insofar as they permit prompt settlement of actual controversies and establish the legal rights and obligations that will govern the parties' relationship in the future." *Hyatt*, 302 F.3d at 711. This Court's authority to decide an action seeking declaratory judgment arises under the Declaratory Judgment Act. *NUCOR*, 28 F.3d at 577 (citing 28 U.S.C. § 2201). "The Declaratory Judgment Act, 28 U.S.C. §

17

2201, allows a party . . . who expects to eventually be sued, to determine his rights and liabilities without waiting for his adversary, the presumptive plaintiff, to bring suit." *DeBartolo v. Healthsouth Corp.*, 569 F.3d 736, 741 (7th Cir. 2009). Moreover, the declaratory judgment plaintiff must be able to show that the feared lawsuit from the other party is immediate and real, rather than merely speculative. *Hyatt*, 302 F.3d at 712 (citing *Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 506-07 (1972); *Norfolk Southern Ry. Co. v. Guthrie*, 233 F.3d 532, 534-35 (7th Cir. 2000)). In sum, the "question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Wisconsin Cent., Ltd. v. Shannon*, 539 F.3d 751, 759 (7th Cir. 2008) (quoting *MedImmune*, 549 U.S. 118).

Helpful to this case is the Seventh Circuit Court of Appeals' description of the "usual declaratory judgment pattern," as one "under which the 'natural' defendant wants to proceed with a business opportunity—e.g., the production of widgets—but it is impeded because of a lack of clarity as to its legal rights, fearing something like a possible patent infringement suit." *Hyatt*, 302 F.3d at 711. Based upon the facts before the Court, it is fair to say that this description fits the case at hand with the additional distinction that the business opportunity – the transfer of ownership of the Ruth's Chris entities – occurred weeks after Plaintiffs filed their claim in this Court. Ms. Shopf urges this Court to find that this transfer eliminated Plaintiffs' ability to seek declaratory relief in this matter because it rendered the transfer "past conduct" that is beyond the reach of the Declaratory Judgment Act. But this argument ignores both the reality of what was occurring at the time Plaintiffs filed their case, and the adverse legal interests that exist for Plaintiffs at this time. When Plaintiffs filed their initial complaint in this matter, Ms. Shopf had threatened to bring suit against Plaintiffs. Therefore, at that time, this case fit squarely within the circumstance

18

described in *DeBartolo*, wherein a party who expects eventually to be sued is able to determine its rights and liabilities without waiting for the presumptive plaintiff to bring suit. The next month, after Plaintiffs closed on the transfer of ownership and Ms. Shopf had filed the Louisiana Suit, Plaintiffs contend that the case or controversy they faced shifted from fear of imminent suit to uncertainty surrounding the legality of the transfer and how such uncertainty would affect the Ruth's Chris entities' ongoing business, their employees, the Franchisor, and other investors. Such uncertainty negates Ms. Shopf's argument that damages have already accrued, [Filing No. 14 at 13 (citing *Cunningham*, 407 F.2d at 1167-68)], and satisfies the case or controversy requirement described by the Seventh Circuit in *Wisconsin Central*. As such, having found that the parties have adverse legal interests of sufficient immediacy and reality to warrant the issuance of a declaratory judgment, the Court has subject-matter jurisdiction to hear this case.

Similarly, the Court, in its discretion, sees fit to hear this declaratory judgment action under the five factors set forth in *NUCOR*. The Court finds that a judgment would settle the controversy between the parties and would bring clarity to the legal relations among the parties. For the reasons set forth herein in finding that the Court can exercise *in personam* jurisdiction over Ms. Shopf, and in consideration of the fact that the Louisiana Suit has been dismissed, the Court finds that Plaintiffs' request for declaratory judgment does not constitute procedural fencing and that there is not a better or more effective remedy. Put simply, this Court is an appropriate forum to determine the controversy at issue in this suit, and the Court will therefore exercise its discretion to hear this action. Ms. Shopf's Motion to Dismiss is therefore **DENIED**.

## IV.
### CONCLUSION

For the reasons detailed herein, the Court **DENIES** Ms. Shopf's Motion to Dismiss on all grounds. [13]

Date: 3/27/2018

_Jane Magnus-Stinson_
Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record.**